1

2

3

4

5

6

7

8        **IN THE UNITED STATES DISTRICT COURT**

9        **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    SUSAN ELLA JACKSON,                     No. CIV S-06-2028-CMK

12                Plaintiff,

13        vs.                                  MEMORANDUM OPINION AND ORDER

14    COMMISSIONER OF SOCIAL
       SECURITY,

15                Defendant.

16    _____/

17            Plaintiff, who is proceeding with retained counsel, brings this action for judicial

18    review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

19    Pursuant to the written consent of all parties, this case is before the undersigned as the presiding

20    judge for all purposes, including entry of final judgment.  See 28 U.S.C. § 636(c).  Pending

21    before the court are plaintiff's motion for summary judgment (Doc. 18) and defendant's cross-

22    motion for summary judgment (Doc. 19).

23                              **I.  PROCEDURAL HISTORY**

24            Plaintiff applied for social security benefits on January 15, 2004.  In the

25    application, plaintiff claims that her disability began on January 1, 2001.  Plaintiff claims that her

26    disability is caused by a combination of herniated discs, degenerative disc disease, stroke,

hypertension, and depression.  Plaintiff's claim was initially denied.  Following denial of

reconsideration, plaintiff requested an administrative hearing, which was held on January 17,

2006, before Administrative Law Judge ("ALJ") Peter F. Belli.   In an April 28, 2006, decision,

the ALJ concluded that plaintiff is not disabled based on the following relevant findings:

> 1. The claimant has not engaged in substantial gainful activity since January 1, 2001.
>
> 2. The medical evidence establishes that the claimant has severe cervical and lumbar disc disease, but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. The claimant's depression and cardiac disease are not severe impairments.
>
> 3. The claimant's testimony is not substantially credible for the reasons stated in the body of this decision.
>
> 4. The claimant has the residual functional capacity to perform work-related activities except for work involving frequently lifting more than 10 pounds, occasionally lifting more than 20 pounds, and performing repetitive postural tasks (20 CFR § 416.945).
>
> 5. The claimant's past relevant work as family advocate community service worker did not require the performance of the work-related activities precluded by the above limitation(s) (20 CFR § 416.965). The vocational expert's testimony that the claimant can perform her past relevant work is fully credited.
>
> 6. The claimant's impairments do not prevent the claimant from performing her past relevant work.
>
> 7. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR § 416.920(e)).

After the Appeals Council declined review on July 12, 2006, this appeal followed.

## II.  SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains the following evidence,

summarized chronologically below:

/ / /

March 11, 1999 – Plaintiff was seen by Dr. Philip Bach, Sacramento Heart and Vascular Medical Association, for a cardiac consultation.  Plaintiff had a hypertensive crisis, with a blood pressure of 210/128, and pulse of 107.  She was admitted into the hospital and treated with Clonidine and Captopril, which reduced her blood pressure.  Her CT scan and MRI of the head did not reveal any bleed or stroke.  Dr. Bach recommended controlling her hypertension and checking to be sure there was no reversible cause for her hypertension. Plaintiff complained of chronic headaches, and reported she was diagnosed with chronic fatigue syndrome in the past.  She also had a history of severe depression.

March 25, 1999 – Follow up with Dr. Bach.  She was started on Norvasc, and he reported she had been doing well and her blood pressure was under good control.  Her vision had also improved slightly.

April 22, 1999 – Follow up with Dr. Bach.  He reported she was doing quite well, her blood pressure remained under excellent control.  She had some mild peripheral edema, for which she was given a prescription of Lozal.  Dr. Bach wanted to decrease her Capoten as tolerated.

August 5, 1999 – Follow up with Dr. Bach.  He notes no recurrence of hypertensive crisis, and her blood pressure has remained under good control with the Norvasc and without the Captopril.  Her intermittent edema was controlled by the Lozal, but she reported mild leg cramps.  Vision showed improvement, and she was able to drive and read again. Her medications were decreased again.

January 13, 2000 – Follow up with Dr. Bach.  Plaintiff reported she had had a foot injury and steroid injection.  Her blood pressure had gone up, and she had to increase her Norvasc.  However, it was drifting down slowly again.  She was instructed to monitor her blood pressure, and reduce the medication as tolerated.  However, she was expected to remain on a dosage of Norvasc chronically.

/ / /

November 9, 2000 – Follow up with Dr. Bach.  Plaintiff's blood pressure remained stabled with Norvasc, but increased significantly when she stopped taking it.  She reported no symptoms of angina or congestive heart failure, but remained chronically fatigued.

October 25, 2001 – Follow up with Dr. Bach.  Plaintiff had reportedly been doing well for over a year, but was having some palpitations.  She had no symptoms of angina or congestive heart failure, and her blood pressure remained under good control.  Dr. Bach's impression was that she had probable benign arrhythmia, and no treatment was warranted.  A stress echocardiogram was ordered to check her heart.

December 10, 2001  –  The stress echocardiogram report.  The conclusions were: negative maximal exercise tolerance testing; normal LV function; normal stress echo; normal blood pressure response to exercise; trivial mitral regurgitation; and mild tricuspid regurgitation.

February 20, 2002  –   Progress notes from Plaintiff's primary care physician, William Barley, indicating Plaintiff's back pain increased.  She reported she had been doing well, but after caring for another person and moving her belongings, her pain had increased.  Dr. Barley prescribed Naprosyn and Ultram, and suggested she might benefit from physical therapy.

March 8, 2002  – Progress notes from Dr. Barley wherein Plaintiff reported the combination of Naprosyn and Ultram gave her 100 percent relief for five hours.  She reported still having pain in right hip and buttock.

March 29, 2002  – Progress notes from Dr. Barley indicating Plaintiff still reporting right hip and back pain when off the medication.  Plaintiff was referred for x-ray and bone scan.

April 1, 2002  – Lumbosacral spine x-ray report revealed "joint space narrowing at L5-S1.  The vertebral bodies and interspaces are otherwise intact.  The posterior elements are normal.  The prevertebral and paraspinous soft tissues are normal."  The impression from the x-ray was "[d]egenerative changes at the 5th lumbar disc.  Otherwise, normal lumbosacral spine."  Pelvis and right hip x-ray revealed "[t]he bones and articulations are intact.  There are no

4

fractures, dislocations, bone lesions, or periosteal reactions.  The overlying soft tissues are normal."  The impression was "[n]ormal pelvis and right hip."  (CAR at 201).

April 19, 2002  –  Progress notes from Dr. Barley wherein Plaintiff reported continuing pain in hip and buttock.  Plaintiff rated her pain as seven out of ten, but with Ultram, pain decreased to one out of ten.

May 21, 2002  –  Progress notes from Dr. Barley stating Plaintiff reported Naprosyn takes the edge off her pain and Ultram helps her sleep.  She reported she goes to the gym three times a week.  Dr. Barley assessed Plaintiff with HNP by MRI, DDD on x-ray.  He found she requires regular Ultram, she failed on NSAIDs and physical therapy, cannot have an epidural, and cannot have steroids.  Plaintiff indicated she wanted to retry physical therapy one more time.

July 8, 2002  –  Physical therapy evaluation, at NovaCare, indicates Plaintiff's primary complaint was low back pain.  Her pain was reported at an 8.  Her range of motion, bending forwarding, was within normal limits but with pain, bank bending was 50% of normal, and side bending was 80% of normal.  Her strength was grossly 4-/5, she had diminished tolerance for sitting, standing, and sleeping.  Plaintiff was assessed as an excellent candidate for physical therapy, and the plan included aquatic therapy for pain control combined with manual therapy techniques and therapeutic exercises.

July 15, 2002  –  Progress notes from Dr. Barley indicating Plaintiff was continuing with physical therapy and Ultram for her lower back pain.  She reported she had moved furniture around at home, and was experiencing aches and spasms.

October 1, 2002  –  Progress notes from Dr. Barley in which Plaintiff was in for a follow up regarding increased back pain.  Her pain increased with prolonged sitting and walking.

October 9, 2002  –  Daily treatment notes, twelfth physical therapy treatment.  Has tolerated physical therapy well, but Plaintiff had indicated she was still pretty sore.  Through the twelve visits, she ranged from doing better to very sore, depending on her activities.  The plan

was to continue physical therapy treatment.

      November 5, 2002  –  Progress notes from Dr. Barley indicating an office visit for unrelated health issues.

      January 3, 2003  –  Progress notes from Dr. Barley indicating an office visit for unrelated health issues.  Lab results included, also relating to other health issues.

      January 14, 2003  –  Imaging results regarding unrelated health issues.

      January 21, 2003  –  Progress notes from Dr. Barley indicating Plaintiff is under a great deal of stress, he recommended counseling and prescribed Ambien.  Plaintiff also requested a spinal evaluation.  Dr. Barley ordered an MRI and back x-rays on January 30, 2003.  He also referred Plaintiff for physical therapy on January 31, 2003.

      February 4, 2003  –  Physical therapy evaluation indicates Plaintiff's pain level was at an eight, her range of motion was limited on forward bending to 40%, on back bending to 50%, and on side bending to 80% of normal.  Her strength was not tested due to pain.  She had a diminished tolerance for sitting and standing at fifteen minutes, diminished tolerance for dressing her lower body, and right innominate posterior rotation.  The plan included two visits per week for three weeks, and was to include aquatic therapy, manual therapy techniques, therapeutic exercises and home exercises.

      February 18, 2003  –  Cervical spine x-ray report indicates a "chronic disc space narrowing at C4-5.  There is no subluxation.  The posterior elements are intact.  The odontoid is normal.  The prevertebral soft tissues are within normal limits.  The neural foramina are widely patent on oblique views."  The impression was "[c]hronic degenerative disc disease at C4-5." (CAR at 187).

      February 25, 2003  –  Progress notes from Dr. Barley indicating Plaintiff reported Ambien helpful and she was still seeing counselor.  She also reported she saw Dr. Kindall, who felt her back pain was from degenerative disc which could not be helped surgically.  She was prescribed Ultram, which helps her back, and was recommended she try an "orthotrac brace," and

consider chiropractic treatment.

February 26, 2003 – Daily treatment notes from physical therapy, after six additional visits, indicate she was tolerating the treatment fairly well and had a new prescription for additional visits.

March 7, 2003 – Physical Therapy evaluation indicates Plaintiff's pain level was then at a five, she still had decreased range of motion, with rotation to the right at 80%, to the left at 60%, flexion was 90%, and extension was 25% of normal.  Her cervical spine strength was grossly 4-/5.  She continued to have diminished tolerance for sitting, within immediate pain, and difficulty with sleep, as she was unable to tolerate lying on her left side.  Her C-2 was also noted as rotated to the right.  The plan was two visits per week for six weeks, and was to include aquatic therapy, manual therapy techniques, therapeutic exercises, home exercises, and monitoring her daily activities.

March 10, 2003 – Progress notes from Dr. Barley indicating Plaintiff was seen for unrelated health issues.  In addition, he notes she is going to physical therapy for neck and back pain, with little help.  She continues with her counseling, and reported the Ultram takes the edge off her pain.

April 9, 2003 – Progress notes from Dr. Barley indicating a visit for blood pressure check.  Plaintiff reported the Ambien helped, she was continuing to see a counselor, the Ultram was not helpful for her lower back pain, and a back brace had been refused by her insurance.

May 2, 2003 – Daily treatment notes from physical therapy, after another twelve visits, indicate Plaintiff generally tolerated the treatment well, but continued to experience pain. The plan was to continue treatment.

June 20, 2003 – Daily treatment notes from physical therapy, after another twelve visits, indicate Plaintiff generally tolerated the treatment well, but continued to experience pain.  There was some indication she was able to be more active, including bike riding.  There

1  was also some indication that she was still having some spasms, she was stressed, and the pain

2  was continuing.  The plan was to continue treatment.

3      July 1, 2003 – Follow up with Dr. Bach, first time since October 2001.  Plaintiff

4  reported a great deal of stress, severe headaches, and increased blood pressure, at 180/112.  She

5  had increased her Lozal and Norvasc, but continued to have an elevated blood pressure.  She also

6  reported increasing palpitations and mild chest discomfort.  Dr. Bach reported an EKG showed

7  sinus rhythm, LVH (left ventricular hypertrophy) with secondary ST&T wave changes.  He

8  recommended increasing her medications, and starting a beta blocker, monitoring of her blood

9  pressure, recheck in two weeks, and once her blood pressure was controlled, an echocardiogram

10  to evaluate the severity of her left ventricular hypertrophy, which was a new finding.

11      July 2, 2003 – Progress notes from Dr. Barley indicating Plaintiff's blood pressure

12  was 148/80.  She reported other readings of 180/100 and 180/120.  She was continuing her

13  counseling regularly, and reported lots of stress but no depression.

14      July 10, 2003 – Follow up with Dr. Bach.  Plaintiff's blood pressure was under

15  better control with the increased dosage of Norvasc and the addition of Toprol.  She reported

16  increasing chest discomfort, described as a heaviness in her chest.  She also reported feeling a

17  little more lethargic due to the Toprol.  Her EKG showed her sinus rhythm was within normal

18  limits.  Dr. Bach decreased the Toprol, continued the Norvasc, and indicated a new

19  echocardiogram and stress test would be ordered in a month.

20      July 16, 2003 – Progress notes from Dr. Barley wherein Plaintiff reported

21  increased back pain due to stress.  She reported sitting for fifteen minutes increased her

22  symptoms, she was having difficulty sleeping and walking, but her symptoms decreased with the

23  Ultram and lying on her back.  She reported her lower back pain was constant, described it as

24  crampy, spasm, and ache, and rated the pain between 4/10 and 8/10.  She did not have symptoms

25  in her leg, but had a knot of pain in her right buttock.  Dr. Barley referred her to Dr. Jay A.

26  Hendrickson.

July 22, 2003 – Initial Consultation with Dr. Hendrickson for low back pain management.  Plaintiff reported aching, burning, sharp and throbbing low back pain, which she rated at 7/10.  The pain is non-radiating.  Alleviating factors included laying flat on her back, heat, medication, and rest; exacerbating factors included standing, sitting, and lifting.  A review of her diagnostic studies include a February 18, 2003, cervical spine series which indicated chronic degenerative disc disease at C4-5 and an April 1, 2002, lumbosacral spine series which indicated degenerative changes at the 5th lumbar disc, but an otherwise normal lumbosacral spine.  A May 31, 2001, MRI of the lumbar spine indicated a small posterior central disc protrusion at L4-5 and right paramedian disc protrusion at L5-S1.  She had negative straight leg raises bilateral, and an antalgic gait.  She was positive bilaterally for tenderness of lumbar facets.  His diagnostic impressions were displacement of lumbar intervertebral disc without myelopathy and lumbar degenerative disk disease.  He recommended a trial of TENS therapy and Lidoderm as well as continuing with both Ultram and Ibuprofen, and aqua therapy.

July 23, 2003 –  Daily treatment notes from physical therapy, after another seven of twelve visits, indicate Plaintiff generally tolerated the treatment well, but continued to experience pain.  The plan was to continue treatment, but there are no further treatment notes in the file.

August 4, 2003 – Progress notes from Dr. Barley wherein Plaintiff was seen for neck pain.  She reported she had fallen the night before.  She had bent over, felt shooting pain in her lower back, fell forward and hit her head.  She reported she was seeing Dr. Hendrickson who had prescribed a TENS unit and Lidoderm patch.

August 4, 2003 – Plaintiff had both a stress echo and Doppler echo.  The stress echo showed: negative maximal exercise tolerance testing; normal LV function; normal stress echo; trivial tricuspid regurgitation; and no clinical changes compared to previous study.  The Doppler echo showed: normal right sided structures; no structural valvular pathology; trivial tricuspid regurgitation; no pericardial effusion seen; normal PA pressures by Doppler; and no

clinically significant change since previous study.

August 13, 2003 – Follow up progress notes with Dr. Hendrickson indicating Plaintiff complaining about increased low back pain, with a rating of 8/10.  She reported her pain was sharp and throbbing, and was worse at night.  Plaintiff had just received the TENS unit, and her Ultram was increased in the evenings.

September 9, 2003 – Progress notes from Dr. Barley indicating Plaintiff's request for a form to be completed.  She also reported Dr. Hendrickson has her on Ultram, and using a TENS unit and Lidoderm regularly.

Dr. Barley also completed a medical evaluation, functional limitation/capacity report at Plaintiff's request.  He indicates Plaintiff can only sit, stand and walk for one hour in an eight hour workday.  He also indicates Plaintiff can rarely bend, stoop, squat, push and/or pull.  She cannot climb, crouch, or kneel.  She may occasionally reach above shoulder level, on the right, and may frequently balance.  Plaintiff is capable of frequently carrying up to ten pounds, and can rarely carry eleven to twenty-four pounds, but not anything over twenty-five pounds.  She is capable of lifting up to ten pounds frequently, eleven to twenty-four pounds occasionally, but never over twenty-five pounds.  She is capable of using both her hands and feet for repetitive movements, and driving automotive equipment, but not being around hazardous equipment or moving machinery nor walking on uneven surfaces.  Dr. Barely stated Plaintiff would best be able to work at sedentary work, but would need to get up frequently.  She would not be able to sit for prolonged periods, greater than thirty minutes.

September 11, 2003 – Follow up with Dr. Bach.  Plaintiff had been stable from a cardiac standpoint.  Her blood pressure was under decent control on medication, she reported no angina, CHF or cardiac arrhythmias.  She did indicate she was under a great deal of stress, and had a severe amount of back pain from her disk disease.  Dr. Bach's impression was that Plaintiff was stable.

/ / /

1    <u>September 15, 2003</u>  – Vocational Evaluation from Michael A. Frank, Ph.D.,

2    CDC.  Frank found that the medical information Plaintiff provided indicated she would have

3    significant difficulties in maintaining a consistent work effort.  If, however, it was medically

4    feasible for her to work, Frank found she would be employable as a Social Services

5    Worker/Assistant, Human Service Worker or Para-professional Counselor.  Her medical

6    condition not withstanding, Frank evaluated Plaintiff's employability, but stated whether she was

7    able to work at all was an issue to be addressed.  A review of Plaintiff's education and

8    employment history revealed that she graduated from high school, and obtained her AA degree in

9    Human Services.  After obtaining her degree, she worked as a Prenatal Advocate for The Family

10    Connection, which included home visits and counseling families on appropriate childcare. While

11    questioning her ability to maintain a consistent work effort with the medical information

12    provided, Frank determined that, not withstanding her medical condition, she would have the

13    transferable skills and education to work as a Human Services Assistant/Social Service Worker

14    non-professional counselor.

15    <u>September 16, 2003</u> – Follow up progress notes from Dr. Hendrickson indicates

16    Plaintiff's low back pain continued to be sharp and throbbing, worse at night, and she rated it at

17    7/10.  She reported a 10% improvement since her first visit and the TENS therapy was helping.

18    She was to continue with Lidoderm, but increased to three per day to get greater coverage.  Her

19    blood pressure reading was noted at 146/104.

20    Progress notes from Dr. Barley wherein Plaintiff was seen for increased blood

21    pressure.  She reported her blood pressure readings at Dr. Hendrickson's office were at 158/109,

22    184/124, 160/100.  However, at Dr. Barley's office, the reading was 156/88.  Plaintiff was

23    advised to increase her Toprol and recheck her blood pressure at home twice a day.

24    <u>September 19, 2003</u>  - Progress notes from Dr. Barley on follow up for increased

25    blood pressure.  Reading was 138/88.  Continued on increased Toprol.

26    / / /

1    October 22, 2003 – Progress notes from Dr. Barley indicating an office visit for

2  unrelated health issues.  Lab results regarding unrelated health issues.

3    October 30, 2003  – Progress notes from Dr. Barley for follow up on unrelated

4  health issues.

5    November 18, 2003 – Progress notes from Dr. Barley for follow up on unrelated

6  health issues.  Plaintiff also reported continuing stress, and feelings of sadness, but not

7  depression.

8    Follow up progress notes from Dr. Hendrickson wherein Plaintiff reported her low

9  back pain was aching, burning and crampy, which she rated at 8/10.  However, she stated her

10  pain had improved by 20% since her first visit.  Dr. Hendrickson recommended she return for

11  follow up in six months, continue with TENS therapy and Lidoderm.  He noted she was unable

12  to have any injection therapy as she has an allergy to steroids.

13    November 25, 2003  –  Progress notes from Dr. Barley indicating an office visit

14  for unrelated health issues.

15    December 10, 2003  –  Progress notes from Dr. Barley indicating an office visit

16  for unrelated health issues.

17    December 23, 2003  –  Surgical pathology report regarding unrelated health

18  issues.

19    January 2, 2004  –  Progress notes from Dr. Barley indicating an office visit for

20  unrelated health issues.   Lab results regarding unrelated health issues.

21    January 23, 2004  –  Progress notes from Dr. Barley indicating an office visit for

22  unrelated health issues.

23    March 3, 2004  –  Psychiatric consultation report, pursuant to a referral from the

24  California Department of Social Services, by Joanna Koulianos, Ph.D.  Plaintiff complained of

25  depression, stating she was on Prozac for five years, until four years ago.  It was noted that

26  Plaintiff had no history of inpatient psychiatric care, but had a history of outpatient counseling

for a period of two years.  She was continuing in that treatment, with counseling appointments twice a month.  Although she was not then taking any psychotropic medication, but she had in the past used Ambien as a sleep agent.  She reported numerous external stressors in her life.  Plaintiff reported the ability to drive, cook, wash clothes, care for her personal grooming and hygiene, grocery shop, go for brief walks, manage personal finances, and interact with friends and family.  She also continued to home school her youngest son.  Plaintiff presented with no evidence of bizarre mentation, prominent anxiety or vegetative depression.  Plaintiff's basic arithmetic reasoning abilities, vocabulary, social judgment, and abstract reasoning abilities, were all within normal limits.  Her general fund of knowledge was at the low average range, and her speech/language functions were grossly intact.  Plaintiff did not appear internally preoccupied.  From a cognitive and emotional standpoint, Plaintiff was found able to execute simple and uncomplicated routine one or two-step job instructions, interact appropriately with peers, supervisors, or co-workers, and execute basic daily activity routines without significant difficulty.  She was also found able to manage transitions or minor stressors associated with employment for entry level job situations, and manage her finances independently.  However, it was suggested that in light of her physical health concerns, that an occupational medical evaluation might be helpful in determining any work related disabilities.

March 9, 2004  – Internal medicine evaluation examination and report by Rajiv Pathak, M.D.  During the examination, Plaintiff described the pain in her lower back as aching, burning, sharp, and throbbing.  She stated the pain is present all the time, at a level of at least three to five out of ten, but can get up to ten out of ten.  She reported standing, sitting and lifting exacerbates the pain, but she does get some relief if she lies flat on her back and uses heat.  It was noted that a May 2001 MRI lumbar spine showed a small posterior central disc protrusion at L4-5 and right paramedian disk protrusion at L5-S1, a whole body bone scan was normal, and x-ray of the lumbar spine showed denervation changes at the fifth lumbar disk.  On physical examination, it was noted that Plaintiff was in mild distress, complaining of low back pain and

had a somewhat hard time finding a comfortable position.  Her cervical spine range of motion

was limited with flexion 20/30 degrees, extension 20/30 degrees, and lateral flexion 20/40

degrees bilaterally.  She had moderate spasm and tenderness of the cervical paraspinous muscles.

Her lumbar spine had normal contour, but there was moderate spasm of the lumbar paraspinous

muscles.  Her lumbar spine range of motion was limited with flexion 60/90 degrees, and lateral

flexion 10/20 degrees bilaterally.  Her straight leg raising test was normal bilaterally at 90

degrees.  She had normal range of motion bilaterally in the shoulders.  Plaintiff reported arose

easily from the examination table, her station was normal, and she walked freely without a limp.

She was able to tandem walk, and walk on her toes and heels without difficulty.  Dr. Pathak

found her pain to be very well localized in the low back, with no evidence of radiculopathy.  She

had normal strength, sensation, and reflexes.  Plaintiff's pain appeared to be genuine.

> Dr. Pathak found Plaintiff had the ability to
>
> sit for about 6 hours in an 8-hour day, although she may not be able to sit for more than 15 minutes at a time.  Bending, climbing and stooping is likely to exacerbate her low back pain, and should be avoided.  She can lift 10 pounds on a frequent basis, and up to 25 pounds on an occasional basis.

(CAR at 280).  He also noted minor vision limitations, but no limitations in her speech or

hearing.

> March 25, 2004 – Physical Residual Functional Capacity Assessment (RFC).

The evaluator found Plaintiff's exertional limitations include the ability to lift and/or carry

twenty pounds occasionally and ten pounds frequently, the ability to stand and/or walk for about

six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday,

and the unlimited ability to push and/or pull.  The evaluator stated that Plaintiff's prior

assessment by her treating physician was inconsistent with her normal gait, intact neuro, good

spinal range of motion, and full range of motion of her extremities.  Instead, the evaluator gave

great weight to the consultative examiner, except finding no support for eroding her sitting

capacity based on the exam and therefore giving that portion little weight.  In addition, the

14

1  evaluator found Plaintiff capable of occasionally climbing, stooping, kneeling, crouching and

2  crawling, and frequently balancing.  No manipulative, visual, communicative, or environmental

3  limitations were found.  The evaluator also found Plaintiff's symptoms not fully supported by the

4  findings, and found them only partially credible.  The evaluator noted that these findings were

5  significantly different from the treating and/or examining sources, but as discussed previously,

6  those findings were inconsistent with Plaintiff's normal gait, intact neuro, good spinal range of

7  motion, and full range of motion in her extremities.

8        March 30, 2004 – Psychiatric Review found Plaintiff's depression not severe.  It

9  was found that Plaintiff's depressive syndrom was only characterized by three symptoms,

10  including sleep disturbance, decreased energy and difficulty concentrating or thinking, not the

11  minimum of four required.  Her depression had only a mild degree of limitation on her daily

12  living activities, ability to maintain social functioning, and maintaining concentration, persistence

13  or pace.

14        May 18, 2004 – Follow up progress notes from Dr. Hendrickson in which

15  Plaintiff reported her low back pain was aching, burning and crampy, at a severity of 6/10.  She

16  reported the increased ability to perform light housework with the help of medication.  She noted

17  her pain has improved 10% from first visit.  She also stated Oxycontin makes her feel drowsy,

18  but calmer.  She wanted to try it for another month, which she was allowed to do.  Dr.

19  Hendrickson recommended she return in four weeks, continue Oxycontin, consider alternate long

20  acting medication like Avinza or Duragesic, and continue short hikes as tolerated.

21        June 16, 2004 – Follow up progress notes from Dr. Hendrickson wherein Plaintiff

22  reported her low back pain was aching, burning, and crampy, rated at 4/10.  She continues to be

23  able to perform light housework with the help of medication.  Her pain has improved by 20%

24  since her fist visit.  The Oxycontin continues to make her sleepy at times and she does not take it

25  on days she drives.  The treatment plan was for Plaintiff to return in four weeks, continue

26  Oxycontin, Lidoderm, and TENS therapy.  It is noted that in addition to the inability to have

steroid injections, Plaintiff also is not a surgical candidate due to her prior stroke.  She reported she discontinued physical therapy due to the commute and her increased pain from driving.  She was encouraged to continue activities with her son.

July 13, 2004 – Follow up progress notes from Dr. Hendrickson indicating Plaintiff's low back pain continues as aching, burning and crampy, now rated at 8/10.  She still reportedly can perform light housework with medication.  She reported a 20% improvement since first visit.  It was recommended she return in four weeks, but it was noted she was stable on her current medication and no changers were necessary.

August 11, 2004 – Dr. Barley completed a short-form evaluation for musculoskeletal impairments.  Therein, he states he first examined Plaintiff on January 10, 2001, had diagnosed her with  LHNP, LDDD, and CDDD.  Her medications included Oxycontin, Ultram, TENS, and Lidoderm.  He indicates her lumbar range of motion is limited to:  flexion 20, extension 20 right lateral 20 and left lateral 30.

August 16, 2004 – Dr. Barley wrote a letter stating Plaintiff

> has been under my care.  This patient has lumbar disc and cervical disc disease.  She also has lumbar herniated discs.  I have been her physician for many years.  She asked that I write a letter regarding her ability to work. [¶] I am not a certified medical evaluator, but 9/03, I filled out a functional limitation/capacity form with the help of [Plaintiff] and based on this form, I concluded that she was only able to perform sedentary work with many limitations (please see form).

(CAR at 146).

February 11, 2005 – Dr. Barley diagnosed Plaintiff with:  lumbar disc disorder with myelopathy, degeneration of lumbar disc, and cervical degenerative disc disease.  He states "[s]he is under chronic pain management for both lower back and upper neck ongoing symptoms. She has chronic conditions which will likely not change for the better in the future."  (CAR at 145).

April 7, 2005 – Physical therapy evaluation.  Plaintiff had a decreased range of motion including cervical forward bending 30%, extension 25%, right side bending 27%, left

side bending 32%, right rotation 62%, and left rotation 53%.  Her  lumbosacral range of motion

forward bending was fingertips to distal thigh "kinks/spasms" with return to neutral, extension

decreased 25%, rotation and side bending generally within functional limits.  Her strength was

within normal limits bilateral upper and lower extremity in regards to neurological assessment,

but some functional strength and muscular endurance decrease in her lower extremity due to

inactivity.  She reported constant shooting pain and tightness in the left cervical region, as well as

pain and tightness with intermittent shooting pain in the lumbosacral region, radiating down.

Current pain rated at 8/10.  She claimed any activity aggravated her pain, including walking,

standing longer than two minutes, and driving.  She also reported excessive fatigue.  The plan

was for Plaintiff to be seen two times per week for four to six weeks, to increase range of motion,

increase strength, and decrease pain.

     April 18, 2005 – Neurosurgical Consultation, Thomas Jones, M.D.  Plaintiff was

evaluated for her chronic low back pain.  She reported that she had undergone physical therapy

and acupuncture, but the pain never completely relented.  She stated the pain is at its worse when

she is standing, and at its best when she is lying flat and still.  However, she stated she was

reasonably able to sit for up to two hours at a time with minimal discomfort.  Upon examination,

the doctor found she was not in acute discomfort, moved easily and did not manifest acute pain.

She had mild trigger points over her low back and the SI joints.  Her hip range of motion was

full, and her straight leg raising was negative.  His impression was "[c]hronic worsening low

back pain statically related to the degenerative pathology in the lower 2 motion segments where

she has evidence not only of degenerative change, but instability."  (CAR at 312).

     May 9, 2005 – Physical therapy progress note.  After eight treatments, Plaintiff

continues to report pain in cervical and lumbar spine regions, especially with increased activity.

She stated the physical therapy has helped loosen things up.  Her range of motion was improved

in most areas, but she still had persistent soft tissue tightness in the lumbar area.  Had some

gradual gains in strength, as well as an increase in tolerating the exercises.

1        July 12, 2005 – Plaintiff canceled physical therapy due to cost.

2        August 4, 2005 – Dr. Barley's Medical Assessment of Ability.  Plaintiff's

3    diagnosis include lumbar disc disorder with myelopathy, herniated disc/degeneration of lumbar

4    disc, cervical degenerative disc disease, and degenerative early spondylolisthesis.  He opined

5    Plaintiff's ability to walk, stand and sit were affected by her impairments, based on MRI, x-rays,

6    and clinical examination.  During an eight-hour work day, he opined Plaintiff was able to

7    walk/stand less than one hour without interruption, and one to two hours total.  She was able to

8    sit less than one hour without interruption, and two to four hours total.  Her ability to lift or carry

9    was also affected, based on examination.  She could occasionally carry up to ten pounds, but

10   never over ten pounds.  She was also restricted in climbing and bending, and required rest

11   periods during the day.  Her current medication included tramadol, Norvasc, Lozal and Toprol.

12   Dr. Barley opined Plaintiff was not capable of performing the full range of sedentary work based

13   on examinations, MRI and specialists reports.  He also opined she was unable to work an eight

14   hour day, five days per week.  Her pain was rated at 5/10, and he found Plaintiff's reports of pain

15   credible.  He did not expect her to improve, pursuant to the specialist's reports.  He rated Plaintiff

16   at G-4 (inability to perform minimal standing or walking required by sedentary work, or inability

17   to do prolonged sitting) and G-5 (can do work as long as alternating sitting and standing; cannot

18   sit at least 6 hours/8 hour day).

19       Hearing Testimony

20       The ALJ held an administrative hearing on January 17, 2006.  At the hearing

21   Plaintiff testified that she could not work as a family counselor or family advocate because she

22   did not "have enough wits about me to do what I did before.  And there's days that I couldn't

23   drive, I wouldn't be able to drive to town."  (CAR at 349).  She stated in 2001, her ability to

24   perform that job was diminished due to a herniated disk and severe back pain.  She claimed her

25   back pain is constant and is located in her lower back.  Her pain starts below her waist and

26   radiates down to the top of her buttocks, then up her back into her shoulder wings and into her

1  neck up to the base of her skull.  The pain in her neck is sharp pain, which also goes down her

2  left arm.  In addition, she has pain in her right hip radiating from her waist.  Plaintiff testified that

3  she can bathe and dress herself, wash and comb her hair, put on her own shoes, button her

4  clothes, except where there are hooks in the back, she can cook, and help clean the house.  She

5  can help with the laundry, but cannot do it on her own, and she cannot make her bed.  She home

6  schools her son, but drives him to Placerville sometimes for tutoring.  She spends about half an

7  hour checking his work and reading what he has written, which she can do lying down.  She

8  drives about twice a week, and does grocery shopping with help from her son.  She often gets up

9  in the middle of the night owing to the pain, about 2:00 a.m., and reads in bed for a while.

10  During the day, Plaintiff testified that she watches TV, does a bit of cooking, visits with friends

11  on the phone and lies on the couch.  She will sometimes use a cane, but it was not prescribed by a

12  doctor.  She described her pain in the morning as being tight, but by the end of the day it's

13  crushing sharp like nerve pain and she cannot usually stand.  Fully medicated, her pain is around

14  a five on a ten point scale.  She stated it is tolerable, and the mediation takes the edge off, but she

15  is never pain free.

16       She testified she uses her TENS machine everyday, which was prescribed by Dr.

17  Hendrickson.  It will cause jerking in her arms and hands, especially her right hand.  She had not

18  seen Dr. Hendrickson for over a year.  She decided to continue treatment with her family

19  physician because Dr. Hendrickson was too far away.  Her current medication included Tramadol

20  and had recently started Percocet.  She stopped taking Oxycontin about six months prior because

21  of the side effects stating "It made me too stupid.  I couldn't function on it.  I couldn't think,

22  drive, or anything."  (CAR at 361).  The Percocet causes fatigue and drowsiness, but is tolerable.

23  She sees her family physician, Dr. Barley, as needed.  At the time of the hearing she had seen

24  him about three weeks prior, for medication, and again about a month prior to that.  She

25  described her medical problems to include a herniated disk, spondylolisthesis, scoliosis.

26  / / /

She further testified that she is seeing a counselor, a licensed clinical social worker, whom she sees once about every six weeks.  The only psychotropic drug she has taken was Prozac for two years, up until about 1996.  She does not exercise.

On bad days, after too much activity, she cannot even drive, she has to lay on the couch with heat packs all day.  She stated she had bad days one to two days per week, because she tries to do too much.  On those bad days her pain is about an eight.  If she rests properly, she usually feels better in a day, at the worst two days.  Driving in a car, helping decorate the Christmas tree, extra cooking, all seem to aggravate her pain.  She can stand up for about fifteen minutes, then she will sit or lay down for a while.  She will need to rest for five to ten minutes, then she can get up again.  Sitting in a chair is also uncomfortable, and she can only sit at the computer for ten to fifteen minutes before her leg, hip, back and neck begin to hurt.  Then she has to lay down for ten to fifteen minutes.  Also, the pain in her neck limits her ability to move it, and work at the computer.  She will spend less than two hours total in a day on the computer, off and on.  She is able to use the mouse and the keyboard.

Plaintiff stated she can help out around the house, doing dishes and cooking, but cannot vacuum, do laundry by herself, or fold sheets anymore.  She makes a full meal about once a week, but it is a simple meal, and she will have to rest in between.  However, she cannot lift any heavy items due to the pain in her neck, and started buying half gallons of milk so she can lift them.

In her previous job as family advocate, she did home visits, where she would drive to her client's homes and bring them materials.  She was usually in the family's home for an hour and a half.  She would bring them books, food, cribs, car seats or whatever they needed.  During the hour and a half at the home, she would interact with the children and help new moms who did not have access to other parents or social support.  She would teach them how to hold the baby.  The farthest she had to drive was Gold Beach.  Her clients would also come to the office for meetings with her.  She would spend about half her time in the office contacting clients

on the phone and such.  She would also drive to the hospital.

She has noticed the pain in her neck has caused her trouble with using her hands.  She has weakness in her hands.  Her vision has been restored, except one section in the right eye.  She has one spot where her vision is missing but it does not cause her much difficulty, except minor problems in reading.  She has, however, passed the eye exam for her drivers license, and generally has no problems with it.

Also testifying at the hearing was vocational expert Susan Creighton-Clavel.  The vocational expert summarized Plaintiff's vocational history as similar to a community worker, although Plaintiff called it an intake worker.  Intake worker is not listed in the DOT, but community worker is close in its description.  As a family advocate she did intake, charts, visits, which is like a community worker.  Community worker is rated as a light job with a SVP of six.  The counseling position Plaintiff had is sedentary with an SVP of seven.  Both are skilled work.  She also testified that she divided up the position 50/50 between community worker and counseling.  The "counselor part would be the sedentary part and the going to different home and moving around would be the other part."  (CAR 383).

## III.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  It is "such evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence.  See Hammock v.

1    Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative

2    findings, or if there is conflicting evidence supporting a particular finding, the finding of the

3    Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

4    Therefore, where the evidence is susceptible to more than one rational interpretation, one of

5    which supports the Commissioner's decision, the decision must be affirmed, see Thomas v.

6    Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

7    standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th

8    Cir. 1988).

9                                    **IV.  DISCUSSION**

10            In her motion for summary judgment, plaintiff argues that the ALJ erred in four

11   ways in determining that she was not disabled.  Specifically, plaintiff argues: (1) the ALJ failed

12   to properly assess all of her impairments at step two; (2) the ALJ failed to accurately characterize

13   the limitations assessed by Social Security's own Consultative Examiners and provide legitimate

14   reasons for rejecting the opinion of her treating physician; (3) the ALJ failed to credit Plaintiff's

15   testimony regarding her pain and functional limitations; and (4) the ALJ erred in finding Plaintiff

16   capable of her past work and in not posing an appropriate hypothetical to the Vocational Expert.

17           **A.    Impairments**

18            Plaintiff alleges that the ALJ failed to include two of her severe impairments,

19   hypertension and depression, in his analysis.  Instead, he screened them out as non-severe at step

20   two.  This was done in error because step two is merely a screening devise to screen out those

21   impairments which have no more than a minimal effect on an individual's ability to work.

22   Plaintiff's hypertension and depression had more than a minimal effect on her ability to work,

23   and were therefore screened out improperly.

24   / / /

25   / / /

26   / / /

22

1    In order to be entitled to benefits, the plaintiff must have an impairment severe

2 enough to significantly limit the physical or mental ability to do basic work activities. See 20

3 C.F.R. §§ 404.1520(c), 416.920(c).[1] In determining whether a claimant's alleged impairment is

4 sufficiently severe to limit the ability to work, the Commissioner must consider the combined

5 effect of all impairments on the ability to function, without regard to whether each impairment

6 alone would be sufficiently severe. See Smolen v. Chater, 80 F.3d 1273, 1289-90 (9th Cir.

7 1996); see also 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. §§ 404.1523 and 416.923. An impairment,

8 or combination of impairments, can only be found to be non-severe if the evidence establishes a

9 slight abnormality that has no more than a minimal effect on an individual's ability to work. See

10 Social Security Ruling ("SSR") 85-28; see also Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.

11 1988) (adopting SSR 85-28). The plaintiff has the burden of establishing the severity of the

12 impairment by providing medical evidence consisting of signs, symptoms, and laboratory

13 findings. See 20 C.F.R. §§ 404.1508, 416.908. The plaintiff's own statement of symptoms alone

14 is insufficient. See id.

15    Here, the ALJ addressed Plaintiff's hypertension as follows:

16    the record shows that inasmuch as the claimant has a history of
      hypertensive heart disease, treating physicians have described her
17    cardiac condition as stable, her blood pressure under decent or
      good control with medications, cardiac testing has been fairly
18    normal, and there [is] an absence of any complaints of angina or
      arrhythmia as of January 2004 (Exhibit 2F/1). This coincides with
19    cardiac testing which shows that a stress echocardiogram report,
      stressed protocol treadmill test and Doppler examination in
20    January 2004 were all negative for cardiac disease (Exhibit 2F/4).
      Further the claimant is not presently being treat[ed] by a physician
21    for any cardiovascular related symptoms, has not been
      recommended to undergo cardiac surgery and has not required
22    emergency medical care or hospitalization for any cardiac related
      symptoms. As such, it is determined that because the claimant's

23

24    [1]    Basic work activities include: (1) walking, standing, sitting, lifting, pushing,
      pulling, reaching, carrying, or handling; (2) seeing, hearing, and speaking; (3) understanding,
25    carrying out, and remembering simple instructions; (4) use of judgment; (5) responding
      appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes
26    in a routine work setting. See 20 C.F.R. §§ 404.1521, 416.921.

1          cardiac condition has not resulted in limitations that would more
         than slightly impair her ability to perform basic work activities, this

2          condition is deemed to be of a non-severe nature (20 CFR §
         416.921).

3 (CAR at 14-15).

4          Similarly, the ALJ found Plaintiff's depression non-severe stating:

5          Although the claimant has complained of depression, she has not
         been prescribed anti-depressant medications in almost 10 years, has

6          not required regular mental health treatment and has not undergone
         psychiatric hospitalization.  This is consistent with the consultative

7          psychological evaluation from Dr. Joanna Koulianos, Ph.D., dated
         March 3, 2004, which concluded that while the claimant has

8          depression, given her normal mental status examination, she does
         not have any limitations in her ability to perform non-exertional

9          work-related activities (Exhibit 8F).  Likewise, a non-examining
         state agency psychiatrist opined in September 2004 that the

10         claimant does not have a severe mental impairment (Exhibit 12F).
         Therefore, it is determined that because the claimant's depression

11         has not resulted in more than slight limitations in her non-
         exertional functioning, this impairment is deemed to be of a non-

12         severe nature (20 CFR § 416.921).

13 (CAR at 15).

14          Plaintiff argues the ALJ failed to recognize significant work related limitations

15 caused by her depression, including those Dr. Koulianos identified.  Specifically, she points out

16 Dr. Koulianos' finding that she was only capable of executing "simple and uncomplicated

17 routine one or two step job instructions" and that she would only be able to "manage transitions

18 or the minor stressors associated with employment . . . [at] entry level job situations."  (CAR at

19 274).  She also argues that the ALJ failed to acknowledge the reports of stress and depression

20 contained in the record, as well as the evidence of on-going treatment for her stress and

21 depression.

22          Defendant responds that the ALJ properly found these impairments were not

23 severe, and that Plaintiff failed to meet her burden of showing that they had more than a minimal

24 effect on her ability to work.  Specifically, the ALJ's finding that she was not prescribed

25 antidepressants in almost 10 years, had not required mental health treatment, and had not

26 undergone psychiatric hospitalization are supported by substantial evidence.

1          The court notes that there is evidence in the record that Plaintiff was under a

2    significant amount of stress.  She reported such to many of her treating physicians.   There is also

3    evidence that she was seeing a counselor for at least a few years.  She even testified at the

4    hearing that she continued to see her counselor once every six weeks.  In addition, there is

5    evidence in the record which indicates she had been diagnosed as depressed.  However, there is

6    no evidence in the record to suggest that her depression or other mental health issues had even a

7    minimal effect on her ability to work.  There are no medical records or evaluation of any

8    disabling effects from her depression from her treating physicians or counselors.  As the ALJ

9    found, the examining physician, Dr. Koulianos, did not find her abilities were affected by her

10   depression.  As Plaintiff points out, Dr. Koulianos did find her able to execute "simple and

11   uncomplicated routine one or two-step job instructions" and "manage transitions or the minor

12   stressors associated with employment [at an] entry level job."  However, Plaintiff contends these

13   findings support her argument that her depression effected her ability to work.  The court does

14   not agree.  Dr. Koulianos' finding that she would be able to manage the stressor associated with

15   an entry level job and execute simple and uncomplicated routine instructions are sufficient

16   evidence that Plaintiff's depression did not effect her ability to work, even if that would be at an

17   entry level position.

18          Therefore, the ALJ's determination that Plaintiff's depression was non-severe was

19   free of legal error and supported by substantial evidence.

20          Similarly, the ALJ's determination that Plaintiff's hypertension was non-severe

21   was supported by the evidence.  Plaintiff argues that she has consistently been assessed with

22   hypertension, and was seen numerous times for elevated blood pressure.  She also had side

23   effects from her blood pressure medication, including that it put her in a "mental fog" and made

24   her lethargic.  In addition, her physician's described her hypertension as "stable" but "poorly

25   controlled."

26   / / /

Defendant responds that the evidence shows Plaintiff's blood pressure was under proper control with medication and did not result in limitations.  In addition, the ALJ's decision was consistent with the evidence and Plaintiff's testimony.

There is substantial evidence in the record indicating that Plaintiff's hypertension was controlled by medication.  While she was consistently diagnosed with hypertension, was being followed and monitored for that condition, and occasionally had an increase in her blood pressure, there is no evidence to suggest it resulted in any limitations.   While she did indicate her medication made her lethargic, there is no suggestion that it had any but a minimal effect on her ability to work.  In addition, there is no opinion in the record indicating any resulting limitations from her hypertension.[2]  Nor did she testify to any such limitations.

"Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility" for benefits, and such a controlled condition would therefore likely be considered non-severe.  Warre v. Comm'r Soc. Sec., 439 F.3d 1001, 1006 (9th Cir.2006) (citing Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004), Lovelace v. Bowen, 813 F.2d 55, 59 (5th Cir. 1987)).   Substantial evidence supports the ALJ's finding that Plaintiff's hypertension was effectively controlled with medication, and therefore is a non-serious condition, and that finding was free of legal error.

### B.    Physician Opinions

Plaintiff next argues that the ALJ erred in not accurately characterizing the limitations assessed by the consultative examiners and erred in rejecting the opinions of her treating physician without legitimate reasons.

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d

---

[2]    Plaintiff has not raised any issues regarding the ALJ's duty to develop the record in this or any other regard.  As such, the undersigned determines any such argument is waived for failure to raise.

821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating

professional, who has a greater opportunity to know and observe the patient as an individual,

than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285

(9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given

to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4

(9th Cir. 1990).

            In addition to considering its source, to evaluate whether the Commissioner

properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are

in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an

uncontradicted opinion of a treating or examining medical professional only for "clear and

convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831.

While a treating professional's opinion generally is accorded superior weight, if it is contradicted

by an examining professional's opinion which is supported by different independent clinical

findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035,

1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be

rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester,

81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of

the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a

finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and

legitimate reasons, the Commissioner must defer to the opinion of a treating or examining

professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional,

without other evidence, is insufficient to reject the opinion of a treating or examining

professional.  See id. at 831.  In any event, the Commissioner need not give weight to any

conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111,

1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion);

see also Magallanes, 881 F.2d at 751.

Here, the ALJ addressed the various physician's opinions in his decision.  As to

Plaintiff's treating physician, Dr. Barley, the ALJ found:

> The record also contains physical capacity assessments from
> treating physician, Dr. Bill Barley, M.D., dated September 9, 2003
> and August 4, 2005, which conclude that the claimant's cervical
> and lumbar disc disease precluded her from sitting, standing, or
> walking for more than 1 hour, performing postural tasks more than
> rarely or at all, and lifting even 10 pounds (Exhibits 3F and 16F).
> However, the undersigned finds that these physical capacities
> assessments are not accorded any weight as: (1) the doctor
> admitted that the claimant actively assisted him in the preparation
> of these documents; (2) the doctor has admitted that he was not a
> certified medical evaluator; (3) it does not appear that the doctor
> has treated the claimant since August 2004; (4) pain management
> records indicate that the claimant's pain has been stable on
> medications; (5) the doctor's findings are at odds with the findings
> of both the consultative physicians and that of a non-examining
> state agency physician; (6) the doctors' finding's are at odds with
> the claimant's wide ranging activities of daily living; (7) the
> doctor's findings are refuted by the radiological imaging studies
> contained in the record; and (8) the doctor's findings are at odds
> with the claimant's lack of recent medical treatment and absence of
> any history of either neck or back surgery.  As such, the
> undersigned does not accord Dr. Barley's physical capacities
> assessments any weight.

(CAR at 15).

In regards to the examining and non-examining consultive opinions, the ALJ

found:

> two consultative medical evaluations which contained clinical
> findings sufficient to establish that the claimant could complete a
> normal workday or workweek.  In the first assessment, dated
> March 9, 2004, Dr. Rajiv Pathak, M.D., an internist, concluded that
> while the claimant has neck and lower back pain with some spasms
> and loss of range of motion, given her normal upper and lower
> extremity range of motion, negative neurological testing and
> straight leg raising, good gait, absence of any radiculopathy,
> deformities, tenderness, or strength deficits, and negative
> peripheral circulation testing, she is fully capable of sitting for
> about 6 hours as long as she can change her position every 15
> minutes at-will, occasionally bend, climb and stoop, frequently lift
> not more than 10 pounds and occasionally lift not more than 25
> pounds (Exhibit 9F).  Insofar as this assessment is generally
> credible, the undersigned disregards that portion limiting the
> claimant to 15 minutes of sitting, standing or walking without
> changing positions every 15 minutes because objective clinical

findings contained in the record are not consistent with limitations
of this nature.  Moreover, the claimant conversely told another
physician, Dr. Thomas Jones (see below), that she was able to sit
reasonably well for up to 2 hours with only minimal pain.  In the
second assessment, dated April 18, 2005, Dr. Thomas Jones, a
neurologist, diagnosed degenerative lumbar pathology with only
mild trigger points, negative neurological testing and straight leg
raising, an absence of any joint deformities or arthritis, and an
ability to move easily and with evidence on any acute pain [sic].
Dr. Jones also recommended that she undergo pain management
rather than surgery and did not set forth any physical limitations in
her functioning (Exhibit 15F).  Similarly, a non-examining state
agency physician noted in March 2004 that the claimant is fully
capable of performing exertions consistent with that of a light
range of work (Exhibit 11F).  Similarly, radiological imaging
studies have not been consistent with evidence of significant
degenerative cervical or lumbar disc disease as x-rays of the
lumbar spine taken in April 2002 revealed degenerative changes at
the 5th lumbar disc level but were otherwise normal and did not
reveal evidence of herniation or significant spinal disease (Exhibit
4F); x-rays of the cervical spine taken in February 2003 disclosed
degenerative cervical disease at C4-5 but were otherwise normal
and did not reveal any disc herniation or significant spinal
instability (Exhibit 4F/13); pelvic and right hip x-rays were normal
in April 2002 (Exhibit 7F); and a whole body scan was normal in
April 2002 (Exhibit 7F).  Likewise, pain management records
demonstrate that the claimant's pain was stable with medications
as of August 2004 and that her pain had improved over time
(Exhibit 7F).  In addition, the claimant's pain complaints are not
consistent with her wide ranging activities which include driving,
home schooling her son, maintaining her own personal appearance,
shopping, doing the laundry, washing dishes, cleaning her house,
visiting friends, cooking, grocery shopping, taking walks,
frequently reading books, and operating a computer.
Consequently, the undersigned finds that based upon the scant
objective clinical findings contained in the record, positive
response to pain management, unremarkable radiological imaging
studies and extensive living activities, the claimant's residual
functional capacity is consistent with that of a light range of work
(i.e., prolonged standing, walking and lifting not more than 10
pounds and occasionally lifting not more than 20 pounds), eroded
only by an inability to frequently climb, stoop, crouch, crawl or
kneel.

(CAR at 14).

Plaintiff argues the ALJ's reasons for rejecting Plaintiff's treating physician's

opinion was insufficient.  First she argues that the ALJ only referenced two of Dr. Barley's

assessments, but did not reference two other assessments Dr. Barley made.  Specifically, the ALJ

rejected Dr. Barley's September 9, 2003 and August 4, 2005 assessments, but ignored the August 11, 2004, evaluation and his February 11, 2005, letter. The two additional opinions referenced Plaintiff's diagnosis of hypertension, cervical degenerative disc disease, and lumbar degenerative disc disease. They also set forth her medications, and her range of motion limitations, as well as noting her chronic pain which was not expected to improve. She further argues that Dr. Barley's indication that Plaintiff assisted him in preparing one of the reports and his statement that he was not a certified medical evaluator were irrelevant. Dr. Barley was her treating physician, and his opinion is accorded great weight. She avers that Dr. Barley's assessments were not inconsistent with the consultative examining physician limitations assessment, and in fact were consistent or less restrictive than those set forth by the consultative examining physician. She also claims there was no evidence that she engaged in the wide ranging activities the ALJ found were incompatible with her condition. Instead, her activities were significantly limited, and she testified as such. Finally, she argues that the ALJ cannot reject her treating physician's opinion, even if it is contradicted by another doctor, without providing specific and legitimate reasons for doing so, which the ALJ did not do.

In response, the Defendant argues the ALJ's finding that Plaintiff retained the ability to perform light work was supported by substantial evidence, including the opinion of the state agency physician, the consultative examiner, and Plaintiff's treating neurologist, Dr. Jones. He also claims the ALJ properly resolved the conflicting opinions.

At issue is the ALJ's finding that Plaintiff is able to sit for long periods of time. Plaintiff's treating physician, Dr. Barely, found Plaintiff unable to sit for longer than an hour uninterrupted. The consultative examining physician, Dr. Pathak, found she may be unable to sit for more than fifteen minutes without changing position. However, the non-examining reviewing physician found that restriction not supported, especially based on Dr. Pathak's largely normal findings on examination. Also significant is Plaintiff's statement to Dr. Jones that she was able to sit for up to two hours at a time with minimal discomfort. The ALJ also supported

his decision by referring to Dr. Jones's assessment of Plaintiff, that she had only mild trigger points, negative neurological testing and straight legs raising, an absence of any joint deformities or arthritis, an ability to move easily and "does not manifest acute pain." (CAR at 14, 311).

If there are contradicting opinions in the record, in order to reject the opinion of a treating physician, the ALJ must set forth specific and legitimate reasons, supported by substantial evidence. If the treating physician's opinion is not contradicted, the ALJ must set forth clear and convincing reasons, supported by substantial evidence, prior to rejecting the opinion. Here, there are contradicting opinions. While a non-examining professional's opinion is insufficient to reject the opinion of a treating or examining professional, without other evidence, here the ALJ not only relied on the non-examining professional's opinion, but also Plaintiff's own statements and Dr. Jones' assessment. Therefore, the ALJ set forth not only specific and legitimate reasons, but clear and convincing reasons for rejecting the limitations on Plaintiff's ability to sit and stand.

The non-examining professional's opinion was that Plaintiff had the ability to sit, stand and walk for about six hours in an eight hour day. This opinion was based on the clinical findings by Dr. Pathak, upon examination, wherein he determined Plaintiff had a normal gait, limited but good range of motion, normal strength, and intact neuro. This opinion contradicted both Dr. Pathak's and Dr. Barley's opinions that Plaintiff's ability to sit for extended periods of time was limited. Therefore, the ALJ was required to identify specific and legitimate reasons for rejecting the limitation in her ability to sit. As stated above, however, the court finds the ALJ set forth clear and convincing reasons for rejecting the limitation on her ability to sit, specifically her contradictory statement to Dr. Jones that she was able to sit for up to two hours with minimal discomfort.

While the undersigned does not necessarily agree with all of the ALJ's reasoning, there was sufficient evidence to support his decision, and the undersigned finds no legal error.

/ / /

1       **C.    Plaintiff's Credibility**

2       Plaintiff next contends that the ALJ erred in rejecting her testimony regarding the

3 nature and extent of her pain.

4       The Commissioner determines whether a disability applicant is credible, and the

5 court defers to the Commissioner's discretion if the Commissioner used the proper process and

6 provided proper reasons. See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996). An explicit

7 credibility finding must be supported by specific, cogent reasons. See Rashad v. Sullivan, 903

8 F.2d 1229, 1231 (9th Cir. 1990). General findings are insufficient. See Lester v. Chater, 81 F.3d

9 821, 834 (9th Cir. 1995). Rather, the Commissioner must identify what testimony is not credible

10 and what evidence undermines the testimony. See id. Moreover, unless there is affirmative

11 evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not

12 credible must be "clear and convincing." See id.; see also Carmickle v. Commissioner, 533 F.3d

13 1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007),

14 and Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

15       If there is objective medical evidence of an underlying impairment, the

16 Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

17 because they are unsupported by objective medical evidence. See Bunnell v. Sullivan, 947 F.2d

18 341, 347-48 (9th Cir. 1991) (en banc). As the Ninth Circuit explained in Smolen v. Chater:

19           The claimant need not produce objective medical evidence of the
[symptom] itself, or the severity thereof. Nor must the claimant produce

20           objective medical evidence of the causal relationship between the
medically determinable impairment and the symptom. By requiring that

21           the medical impairment "could reasonably be expected to produce" pain or
another symptom, the Cotton test requires only that the causal relationship

22           be a reasonable inference, not a medically proven phenomenon.

23 80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in Cotton v. Bowen, 799

24 F.2d 1403 (9th Cir. 1986)).

25 / / /

26 / / /

The Commissioner may, however, consider the nature of the symptoms alleged, including aggravating factors, medication, treatment, and functional restrictions.  See Bunnell, 947 F.2d at 345-47.  In weighing credibility, the Commissioner may also consider: (1) the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5) physician and third-party testimony about the nature, severity, and effect of symptoms.  See Smolen, 80 F.3d at 1284 (citations omitted).  It is also appropriate to consider whether the claimant cooperated during physical examinations or provided conflicting statements concerning drug and/or alcohol use.  See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the claimant testifies as to symptoms greater than would normally be produced by a given impairment, the ALJ may disbelieve that testimony provided specific findings are made.  See Carmickle, 533 F.3d at 1161 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

Here, the ALJ stated he:

> has carefully considered the claimant's symptoms of neck and back pain and cardiac disease in terms of the criteria of Social Security Ruling 96-7p and has concluded that her complaints are out of proportion to the overall weight of the objective medical evidence of record and other factors of a non-medical nature and therefore, renders her testimony not substantially credible.  In this regard, the record establishes that notwithstanding the claimant's neck and back pain complaints, She does not have evidence of significant degenerative spinal pathology, surgery has not been recommended, participation in a pain management program has been successful in controlling her symptoms, medical care has consisted of only occasional visits for medication refills, activities of daily living are extensive, and she has been able to move about and get around without much difficulty.
> . . .
>
> Moreover, the claimant conversely told another physician, Dr. Thomas Jones . . , that she was able to sit reasonably well for up to 2 hours with only minimal pain.
> . . .
>
> In addition, the claimant's pain complaints are not consistent with her wide ranging activities of daily living which include driving,

1        home schooling her son, maintaining her own personal appearance,
          shopping, doing the laundry, washing the dishes, cleaning her
2        house, visiting friends, cooking, grocery shopping, taking walks,
          frequently reading books, and operating a computer.
3  (CAR at 13-14).

4        Plaintiff argues there was nothing in the record to support the ALJ's finding that

5  she was not credible.  There was substantial medical evidence documenting her degenerative disc

6  disease, disc protrusions, hypertension and depression.  However, the ALJ discredited her

7  testimony regarding the symptoms normally associated with all of these impairments.  She claims

8  the ALJ failed to offer clear and convincing reasons for rejecting her testimony and finding her

9  not substantially credible.  She argues her testimony was consistent with her impairments, and

10  that her daily activities were minimal and hardly evidence of an ability to engage in substantial

11  gainful employment.

12        Defendant responds that the ALJ properly found Plaintiff's testimony not fully

13  credible.  He argues that the ALJ properly found Plaintiff responded well to conservative pain

14  management treatment, her daily activities were rather extensive, and the objective evidence

15  showed that Plaintiff had only mild degenerative changes in her spine.  The ALJ's decision was

16  thus supported by substantial evidence.

17        The undersigned agrees there is no evidence of malingering in the record.  The

18  undersigned also agrees that Plaintiff meets the Cotton test, in that she produced objective

19  medical evidence of an impairment which could reasonably be expected to produce some degree

20  of her symptoms.  See Smolen, 80 F.3d at 1282.  Therefore, prior to the ALJ rejecting Plaintiff's

21  testimony he had to set forth clear and convincing reasons for doing so.  Such reasoning may

22  include a Plaintiff's reputation for lying, inconsistent statements, or testimony showing that the

23  Plaintiff was less than candid; unexplained or inadequately explained failure to seek or follow

24  treatment; and a Plaintiff's daily activities.

25        The ALJ found Plaintiff's level of treatment inconsistent with her testimony of

26  extreme pain.  Specifically, the ALJ found that her pain was stable with medications as of August

1    2004 and her pain had improved over time.  The ALJ also found Plaintiff's testimony

2    inconsistent with her statements to Dr. Jones, wherein she stated she could sit with only minimal

3    pain for up to two hours.  This is a far cry from the fifteen minutes she testified to.  The ALJ also

4    found Plaintiff did not seek treatment with the frequency one would expect for someone with

5    continuing and increasing debilitating pain.  Particularly relevant is the lack of treatment from

6    August 2004 forward.  Plaintiff last saw Dr. Hendrickson, the pain management specialist, in

7    August 2004.  Thereafter, the only treatment notes contained in the record are from Plaintiff's

8    physical therapy treatment in 2005.  Her last treatment notes from Dr. Barley are from January

9    23, 2004.  Thereafter, the only records from Dr. Barley are his assessments of Plaintiff's

10   impairments.  The administrative hearing in this case was in January 2006.  Therefore, there are

11   no treatment records for over a year prior to the hearing.  The undersigned finds the ALJ's

12   determination that the level of treatment is not consistent with Plaintiff's testimony of extreme

13   pain is supported by substantial evidence.

14          Therefore, the undersigned finds the ALJ's decision to not credit Plaintiff's

15   testimony is supported by substantial evidence and free of legal error.  Most significantly, the

16   ALJ's finding that Plaintiff's level of treatment and inconsistent statements as a basis for

17   disbelieving her testimony are sufficiently clear and convincing, and supported by substantial

18   evidence.

19          **D.      Past Work/Hypothetical Question**

20          Finally, Plaintiff argues the ALJ erred in finding Plaintiff capable of performing

21   her past work as a family advocate community service worker, and failing to pose a hypothetical

22   question to the vocational expert based on the limitations set forth by her treating physician.

23          Hypothetical questions posed to a vocational expert must set out all the

24   substantial, supported limitations and restrictions of the particular claimant.  See Magallanes v.

25   Bowen, 881 F.2d 747, 756 (9th Cir. 1989).  If a hypothetical does not reflect all the claimant's

26   limitations, the expert's testimony as to jobs in the national economy the claimant can perform

1   has no evidentiary value.  See DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  While

2   the ALJ may pose to the expert a range of hypothetical questions based on alternate

3   interpretations of the evidence, the hypothetical that ultimately serves as the basis for the ALJ's

4   determination must be supported by substantial evidence in the record as a whole.  See Embrey v.

5   Bowen, 849 F.2d 418, 422-23 (9th Cir. 1988).  However, a hypothetical need only include the

6   limitations the ALJ found were supported by the record.  See Bayliss v. Barnhart, 427 F.3d 1211,

7   1217-18 (9th Cir. 2005).

8            Here, the ALJ stated:

9            The claimant's past relevant work experience as a family advocate
             community service worker was described by the vocational expert
10           as a light occupation with an SVP of 6 (DOT 195.367-018).
             Consequently, the undersigned credits the vocational expert's
11           testimony and finds that because the claimant is fully capable of
             performing her prior occupation as a family advocate community
12           service worker, she is not disabled within the meaning of the
             Social Security Regulations and Act, as presently amended (20
13           CFR § 416.920(e)).

14   (CAR at 15).

15           Plaintiff argues, based on the opinion by her treating physician, Dr. Barley, as well

16   as the examining physicians, she would not be able to perform her past work.  Specifically, Dr.

17   Barley opined she would not be able to walk/stand without interruption for a total of one hour per

18   day, stand for a total of one to two hours a day, sit for a total of two to four hours per day, lift and

19   carry five to ten pounds, unable to climb or bend, and would require rest periods.  She claims this

20   is also supported by the opinion of the examining physician, Dr. Pathak, that Plaintiff could not

21   sit more than fifteen minutes at a time.  In addition, Plaintiff argues that Dr. Koulianos opined

22   she would only be able to handle simple one and two step jobs at an entry level job.  Her past

23   work was beyond Plaintiff's physical and mental capabilities.  Finally, she argues the ALJ erred

24   in not posing a hypothetical to the vocational expert, which was required based on her testimony,

25   the medical facts, diagnoses and medical opinions.  She bases this argument on the ALJ's

26   erroneous rejection of her treating physician's opinion as well as the opinions of the consultative

36

1    examiners.

2           Defendant responds that no hypothetical was required because the ALJ concluded

3    that she was able to do her past relevant work.  The vocational expert described Plaintiff's past

4    occupation as sedentary to light, which was within the limitations the ALJ found.

5           Plaintiff's argument is based on the ALJ's RFC findings.  The ALJ found Plaintiff

6    maintained the abilities to perform "a light range of work (i.e., prolonged standing, walking and

7    lifting not more than 10 pounds and occasionally lifting not more than 20 pounds), eroded only

8    by an inability to frequently climb, stoop, crouch, crawl or kneel."  (CAR at 14).  As discussed

9    above, the ALJ's rejection of the limitations on her ability to sit, stand and walk were supported

10   by substantial evidence and were free of legal error.  To the extent Plaintiff is arguing that the

11   ALJ erred in his questioning of the vocational expert, and failure to submit such limitations he

12   had rejected, the court finds no error.

13          Plaintiff also appears to be arguing that the ALJ erred in not posing a hypothetical

14   which included a diminished cognitive ability based on Dr. Koulianos's opinion that she could

15   only perform simple one and two-step instructions at an entry level job.  Plaintiff has never

16   claimed a cognitive impairment.  In her application, as well as her motion for summary

17   judgment, the only mental impairment she claims is depression.  As discussed above, the ALJ's

18   finding that her depression was a non-severe condition was supported by substantial evidence

19   and was free of legal error.  Dr. Koulianos did not link her finding that Plaintiff is limited to one

20   or two-step instructions at an entry level job to her depression.  Based on Dr. Koulianos' report,

21   it appears this finding was based on testing of her memory functions, and finding that her ability

22   to recall was somewhat limited, estimating her abilities at the low average-average range.  But

23   there is nothing in this report to indicate this slightly diminished capacity is due to Plaintiff's

24   depression, the only mental impairment at issue here.  Therefore, to the extent Plaintiff is

25   claiming the ALJ erred in not discussing the limitations expressed by Dr. Koulianos, the

26   undersigned finds no error.

1       As determined above, there was no error in the ALJ's determination of Plaintiff's

2   RFC.  Plaintiff's RFC limited her to light work, with some additional postural limitations. The

3   vocational expert testified that Plaintiff's past work was classified as sedentary to light.  Once the

4   ALJ determined, based on the vocational expert's testimony, that Plaintiff's past relevant work

5   was sedentary to light, which was within the limitations identified in the RFC, he was not

6   required to pose any hypothetical to the vocational expert.  His failure to pose an unnecessary

7   hypothetical to the vocation expert was not erroneous.

8                                   **V.  CONCLUSION**

9       Based on the foregoing, the court concludes that the Commissioner's final

10  decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY

11  ORDERED that:

12          1.      Plaintiff's motion for summary judgment (Doc. 18) is denied;

13          2.      Defendant's cross-motion for summary judgment (Doc. 19) is granted; and

14          3.      The Clerk of the Court is directed to enter judgment and close this file.

15

16   DATED:  September 25, 2009

17

18                                          **CRAIG M. KELLISON**
                                            UNITED STATES MAGISTRATE JUDGE
19

20

21

22

23

24

25

26